# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*In re M.W.*, 2013 IL App (1st) 103334

| | |
|---|---|
| Appellate Court Caption | *In re* M.W., a Minor (The People of the State of Illinois Petitioner-Appellee, v. M.W., a Minor, Respondent-Appellant). |
| District & No. | First District, Sixth Division<br>Docket Nos. 1-10-3334, 1-10-3541 cons. |
| Filed | March 1, 2013 |
| Rehearing denied | April 4, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from a finding that respondent minor was guilty of multiple offenses arising from a vehicular hijacking, the appellate court rejected arguments that respondent did not knowingly waive his *Miranda* rights, that his mother was improperly excluded from the courtroom, that his counsel served as both defense counsel and guardian *ad litem*, thereby creating a conflict of interest, and that respondent's mother was entitled to separate counsel. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-JD-4128; the Hon. Colleen F. Sheehan, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Emily E. Filpi, all of State Appellate Defender's Office, of Chicago, for appellant M.W.

Timothy F. Moran, of Chicago, for appellant C.W.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Kalia M. Coleman, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE REYES delivered the judgment of the court, with opinion.
Presiding Justice Lampkin and Justice Gordon concurred in the judgment and opinion.

**OPINION**

¶ 1    This consolidated matter comes before this court following an adjudicatory hearing in the juvenile justice division of the circuit court of Cook County. The trial judge found the minor defendant, M.W., guilty of attempted first degree murder (720 ILCS 5/9-1(a)(1) (West 2006)), vehicular hijacking (720 ILCS 5/18-3 (West 2006)), aggravated vehicular hijacking (720 ILCS 5/18-4(a)(3) (West 2006)), possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2006)), and two counts of aggravated battery (720 ILCS 5/12-4(a), (b) (West 2006)). After hearing factors in aggravation and mitigation, the trial judge sentenced M.W. to the Juvenile Department of Corrections until his twenty-first birthday. Both M.W. and his mother, C.W., filed separate appeals, which have now been consolidated.

¶ 2    On appeal, M.W. argues: (1) he did not make a knowing and intelligent waiver of his *Miranda* rights; (2) the exclusion of his mother from the courtroom violated his right to a fair trial; and (3) he was deprived of his right to counsel when his attorney acted as guardian *ad litem* in the delinquency proceedings against him. Additionally, his mother, C.W., contends: (1) she was denied her right to separate appointed counsel; (2) she was denied due process and equal protection when she was excluded from the courtroom; (3) she was denied due process when the trial court failed to meaningfully consider M.W.'s motion to dismiss; and (4) the trial court erred in finding M.W. guilty.

¶ 3    For the reasons that follow, we find that: (1) the evidence sufficiently supports the trial court's finding that M.W. knowingly and intelligently waived his *Miranda* rights; (2) the exclusion of his mother from the courtroom as a potential witness was not an abuse of discretion; (3) defense counsel did not act as guardian *ad litem*; (4) C.W. did not have the right to a separate attorney; and (5) C.W. lacks standing to challenge M.W.'s motion to dismiss and adjudication of delinquency.

¶ 4                                    BACKGROUND

¶ 5        The evening of June 13, 2006, M.W., age 16, and another assailant approached the driver of a vehicle located in the parking lot of a Chipotle restaurant at 95th Street and Oakley Avenue in Chicago. M.W. and the other assailant flung open the driver's door, punching the driver as they pulled him from the automobile. During the attack, one of the assailants violently struck the driver in the head with a brick, leaving him with severe brain injuries. M.W. and the other assailant then entered the vehicle and attempted to speed away before ultimately driving the automobile into a tree. The two immediately fled the scene.

¶ 6        After uncovering M.W.'s fingerprints from the stolen vehicle, the police brought M.W. to the station for questioning by Detective Stan Kolicki and Detective William Sotak on August 17, 2006. M.W.'s mother, C.W., accompanied him to the station and sat next to M.W. in the conference room. The detectives left the door to the conference room open throughout the entire interrogation. Prior to questioning M.W., Detective Kolicki advised him of his rights. Detective Kolicki slowly read each aspect of the *Miranda* warning one at a time. Before advising M.W. of the next warning, Detective Kolicki inquired if M.W. understood the previously read portion of the warning. Each time, M.W. informed Detective Kolicki that he understood what the warning meant. C.W. also stated to Detective Kolicki she understood the warnings as well. According to Detectives Kolicki and Sotak, M.W. appeared composed throughout questioning and did not appear nervous, distraught, or confused. During the approximately six- to seven-minute interrogation, M.W. confessed his involvement in the attack and robbery. After C.W. attempted to end the interrogation by leaving, the detectives placed M.W. in police custody.

¶ 7        On October 4, 2006, defense counsel filed a "Motion to Suppress Statements." In the motion, M.W. argued he was "unable to appreciate and understand the meaning of his *Miranda* rights" and thus "any relinquishment of these rights *** was not made voluntarily, knowingly, and intelligently." To support this argument, defense counsel requested that M.W. be psychologically evaluated to determine whether he was competent enough to waive his *Miranda* rights. The trial court granted this request and Dr. Ascher Levy, a clinical psychologist, conducted two examinations of M.W.

¶ 8        The first examination took place on October 30, 2007, over a year after the police interrogation. During the first examination, Dr. Levy asked M.W. if he could explain the meaning of the *Miranda* warnings. M.W. related to Dr. Levy he had the "right to be quiet" and could have "a lawyer or public defender when they are asking you questions." M.W. also explained that a lawyer could be helpful because "[w]hatever the cops ask you, they, the attorney, tell you, '[d]on't say it.' " Finally, M.W. revealed that an appointed attorney meant "[i]f you ain't got no money, they'll give you a lawyer–they'll give me a lawyer."

¶ 9        Dr. Levy ultimately concluded M.W. was capable of knowingly and intelligently waiving his *Miranda* rights at the time of the interrogation and testified accordingly. At the suppression hearing, Dr. Levy testified M.W.'s learning disability "did not appear to significantly affect his functional communication skills." Dr. Levy further acknowledged M.W. had familiarity with the "process of a police interview" and possessed "street smart[s]" and "common sense." Substantially relying on this testimony, the trial judge found the

evidence overwhelmingly demonstrated that M.W. knowingly and intelligently waived his *Miranda* rights and denied M.W.'s "Motion to Suppress Statements."

¶ 10    On June 3, 2010, M.W.'s adjudicatory hearing commenced. Prior to the parties' opening statements, the trial judge granted defense counsel's motion to exclude all witnesses from the courtroom. As the State began its opening statement, the trial judge noticed C.W. sitting in the gallery and asked the parties whether she was going to be called as a witness. Defense counsel replied, "I can't really say now, Judge. But I would ask that the witness–all possible witnesses be excluded." The trial judge informed defense counsel, "Either she can stay in the court or she can testify. So if you're planning on having her testify, she has to leave." Pursuant to the motion to exclude, C.W. was then required to leave the courtroom. The hearing proceeded and the trial judge found M.W. guilty of all charges, relying on M.W.'s incriminating statements and the corroborating testimony from trial witnesses.

¶ 11                                ANALYSIS

¶ 12                           I. *MIRANDA* WAIVER

¶ 13    M.W. argues he did not knowingly and intelligently waive his *Miranda* rights before speaking with Detective Kolicki and Detective Sotak on August 17, 2006. The State has the burden of proving, by a preponderance of the evidence, that the defendant made a knowing and intelligent waiver of his or her *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 475 (1966); *People v. Reid*, 136 Ill. 2d 27, 51 (1990). Once the State has established a *prima facie* case, the burden then shifts to the defendant to prove the waiver was not knowing and intelligent. *Id.* If the court finds under the totality of the circumstances the waiver was not knowing and intelligent, no evidence obtained as a result of the interrogation may be used against the defendant. *Miranda*, 384 U.S. at 479. On appeal, we afford great deference to the trial court's factual findings and reverse those findings only if they are against the manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995). We review *de novo*, however, the ultimate question of whether the waiver was knowing and intelligent. *Id.*

¶ 14    M.W. argues the totality of the circumstances–M.W.'s age, attention deficit disorder, learning disability, lack of interrogation experience, and the overall circumstances of the interrogation–reveal that M.W. did not knowingly and intelligently waive his *Miranda* rights. We do not find this argument persuasive. While defense counsel has presented evidence of M.W.'s youth, attention deficit disorder, learning disability, and lack of interrogation experience, defense counsel has not presented evidence to establish that these factors affected his capacity to intelligently and knowingly waive his *Miranda* rights. The evidence, in fact, is to the contrary.

¶ 15    Dr. Levy, a witness for the defense, twice examined M.W. and reported his findings. Dr. Levy concluded M.W.'s learning disability "[did] not appear to significantly affect his functional communication skills and was thus insufficient to affect his ability to knowingly and intelligently waive his *Miranda* rights." Dr. Levy found that M.W.'s age and functional

communication skills at the time of interrogation were sufficiently advanced to infer that M.W. could intelligently waive his *Miranda* rights. Dr. Levy further opined that M.W. had "street smart[s]" and "common sense" and was well acquainted with a lawyer's role in the proceedings and still waived his right to counsel.

¶ 16    Dr. Levy's testimony regarding his examinations thoroughly supports his conclusions. During the first examination, Dr. Levy asked M.W. what each of the *Miranda* warnings meant. In response, M.W. explained he had the "right to be quiet," the right to have a "lawyer or public defender when they are asking you questions," and further added, "[i]f you ain't got no money, they'll give you a lawyer–they'll give me a lawyer." When asked how an attorney might be helpful, M.W. responded, "[w]hatever the cops ask you, they, the attorney, tell you, '[d]on't say it.' " These responses demonstrate M.W. not only understood the rights the *Miranda* warnings encompassed, but also understood the consequences in not invoking them.

¶ 17    Moreover, the circumstances of the interrogation presented no additional factors to otherwise diminish M.W.'s capacity for waiver. The interrogation lasted only several minutes. There is no evidence the detectives acted rudely, forcefully, or coercively. M.W.'s mother accompanied him for the entirety of the questioning. The door to the conference room remained open. M.W. never appeared nervous, pressured, or scared. Detective Kolicki slowly read each part of the *Miranda* warnings separately, asking M.W. each time whether he understood that right. M.W. had ample opportunity to reflect on every aspect of the warning and told Detective Kolicki he understood them.

¶ 18    M.W. argues, however, the one year and two months that had lapsed between the interrogation and the examination undermined Dr. Levy and the trial court's conclusions. According to M.W., because he acquired experience and intelligence in the subsequent year, we should afford little significance to an examination occurring after that period. While we acknowledge the likelihood M.W. developed intellectually after the interrogation, the lapse in time does not seriously discredit Dr. Levy's overall findings. Dr. Levy ultimately concluded that M.W. could knowingly and intelligently waive his *Miranda* rights at the time of the interrogation. Dr. Levy was a credible witness who based his opinion on findings from two separate examinations of M.W. Dr. Levy could "not identify any factors present during [M.W.'s] interview with the police" that would sufficiently hinder M.W.'s ability to waive his *Miranda* rights. Further, during defense counsel's redirect examination, Dr. Levy testified that it did not necessarily follow that just because the interrogation occurred one year earlier, M.W. was less capable of waiving his *Miranda* rights at the time of the interrogation. Most importantly, there is no evidence that M.W. was incapable of waiving his *Miranda* warnings. Presented with Dr. Levy's expert opinion and the circumstances of the interrogation, we will not speculate that simply because M.W. was one year younger at the time of the interrogation, he must have been incapable of waiver.

¶ 19    We recognize M.W.'s youth and infirmities at the time of the interrogation. Nevertheless, these infirmities do not automatically render one's *Miranda* waiver invalid. See, *e.g.*, *In re W.C.*, 167 Ill. 2d 307 (1995) (12-year-old child knowingly and voluntarily waived *Miranda* rights despite IQ of 47, mild mental retardation, and comprehension skills of a second grader). The detectives took great care in advising M.W. of his rights and all of the evidence supports the finding that M.W. had the intellectual capacity to understand and waive those

rights at the time of the interrogation. Accordingly, we do not find M.W.'s argument that his statements should have never been introduced at trial persuasive.

¶ 20                 II. EXCLUSION OF THE MOTHER FROM THE COURTROOM

¶ 21     M.W. and C.W. separately challenge her exclusion from the courtroom as a potential witness. We address each of these challenges separately.

¶ 22                             A. M.W.'s Right to Fair Trial

¶ 23     M.W. argues the exclusion of his mother, C.W., from the courtroom violated his right to a fair trial. The exclusion of witnesses from the courtroom is a matter resting within the sound judgment of the trial court. *People v. Chennault*, 24 Ill. 2d 185, 187 (1962). By removing potential witnesses from the courtroom, the court seeks to preclude witnesses from shaping their testimony to conform to that of witnesses who have already testified. *People v. Dresher*, 364 Ill. App. 3d 847, 862 (2006). We review decisions to exclude witnesses under the abuse of discretion standard. *Chennault*, 24 Ill. 2d at 187. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

¶ 24     As M.W. explains, the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2006)) makes C.W. a party-respondent under the statute, conferring on her a "right to be present." See 705 ILCS 405/1-5(1) (West 2006); *In re A.K.*, 250 Ill. App. 3d 981, 987 (1993). M.W. argues the trial judge may not exclude C.W. as a party to the proceedings. M.W. relies on the proposition that "[a]lthough the trial court has the power to exclude witnesses from the courtroom, a party to the action who is also a witness is not included under this rule." *North Shore Marine, Inc. v. Engel*, 81 Ill. App. 3d 530, 534 (1980). This court has already rejected this argument. See *In re J.E.*, 285 Ill. App. 3d 965 (1996) (not an abuse of discretion or deprivation of due process to exclude juvenile's parents from courtroom); *In re Yates*, 35 Ill. App. 3d 829 (1976) (not an abuse of discretion to exclude legal guardian from courtroom); *In re Akers*, 17 Ill. App. 3d 624 (1974) (not an abuse of discretion to exclude juvenile's mother from courtroom until after she testified).

¶ 25     In light of this precedent, M.W. relies on cases from other jurisdictions, asking us to overrule *In re J.E.*, *In re Yates*, and *In re Akers*. According to M.W., *In re J.E.*, *In re Yates*, and *In re Akers* fail to address the unique party-respondent status afforded to the legal guardian under the Act and, instead, incorrectly treat them as ordinary witnesses. None of these cases directly refer to the parents or legal guardians as a "party-respondent." Nevertheless, these cases do directly interpret the rights afforded the legal guardian as a party-respondent under the Act and specifically define the scope of a parent's or legal guardian's right to be present at an adjudicatory hearing. In defining such rights, this court found that a parent's or legal guardian's right to be present is not absolute and "does not undermine the court's power to exclude a legal guardian as a witness from an adjudicatory hearing for the purpose of securing uninfluenced testimony." *In re J.E.*, 285 Ill. App. 3d at 980.

¶ 26     Additionally, we note that M.W.'s claim he was denied a fair trial is undermined by the fact that C.W. was excluded pursuant to M.W.'s own motion. M.W.'s defense counsel initially brought the motion to exclude prior to the commencement of the hearing. During opening statements, defense counsel agreed with the trial judge that C.W. should be excluded; defense counsel stated, "I would ask that the witness–all possible witnesses be excluded." In Illinois, "[i]t is a well-settled principle of law that an accused may not ask the court to proceed in a given manner and then assign as error in a court of review the ruling or action which he procured." *People v. Heard*, 396 Ill. 215, 219-20 (1947). Accordingly, we cannot find the trial judge abused her discretion in excluding C.W. from the courtroom.

¶ 27                    B. C.W.'s Due Process and Equal Protection Rights

¶ 28     C.W. separately argues her exclusion violated her due process and equal protection rights under the fourteenth amendment of the United States Constitution. For her due process claim, C.W. relies on language from *In re Gault*, which states, "[due process] does not allow a hearing to be held in which a youth's freedom and his parents' right to his custody are at stake without giving them timely notice, in advance of the hearing, of the specific issues that they must meet." *In re Gault*, 387 U.S. 1, 33-34 (1967). According to C.W., this language necessarily implies parents have a due process right to stay in the courtroom "[i]n order to meet the issues." The language relied on by C.W., however, interprets the fourteenth amendment's due process clause as providing parents with the constitutional right to timely and specific notice in a juvenile delinquency case. C.W. fails to show how this due process requirement of notice carries with it a separate and specific due process right to remain in the courtroom despite one's status as a potential witness. We accordingly reject C.W.'s argument that her due process rights had been violated.

¶ 29     C.W. additionally argues her equal protection rights were violated. According to C.W., she belongs to a class, parents in delinquency proceedings, similarly situated to all other civil litigants who, as parties to the proceedings, cannot be forced to leave the courtroom despite potentially appearing as a witness. By having treated C.W. differently than other civil litigants, C.W. argues, the trial court violated her right to equal protection. C.W.'s comparison to all other civil litigants is not persuasive. In particular, the Illinois legislature specially conferred C.W.'s status as a party-respondent in a juvenile delinquency proceeding via the Act. The right to be present granted to a party-respondent under the Act is "not absolute" and does not include the right to stay in the courtroom despite one's status as a potential witness. *In re J.E.*, 285 Ill. App. 3d at 980. Accordingly, C.W. has not been denied equal protection.

¶ 30                              III. CONFLICT OF INTEREST

¶ 31     M.W. argues his attorney, Thomas O'Connell, acted as guardian *ad litem* and defense counsel simultaneously, depriving him of his right to conflict-free representation. Under Illinois law, an attorney performing both the functions of defense counsel and guardian *ad litem* constitutes a *per se* conflict of interest. *People v. Austin M.*, 2012 IL 111194, ¶ 78. M.W. relies on an ambiguous order entered August 22, 2006 as evidence of O'Connell's role

as guardian *ad litem*. The order states, "THOMAS O'CONNELL is appointed (attorney of record/guardian ad litem/both) for [M.W.] (minor)." No role was circled or underlined on the order. M.W. points to no other section of the record where O'Connell is referred to as guardian *ad litem* and offers no evidence as to O'Connell functioning in this capacity.

¶ 32   Moreover, the record on appeal is seemingly incomplete, as it fails to include reports of all of the proceedings held on August 22, 2006. The burden of presenting a sufficiently complete record rests with the appellant. *Midstate Siding & Window Co. v. Rogers*, 204 Ill. 2d 314, 319 (2003). Any doubts arising from an incomplete record will therefore be resolved against the appellant. *Id.* The record as presented by the parties indicates the public defender, Jared Gable, sought to withdraw from representing M.W. at a status hearing on August 22, 2006. According to the record, the private attorney who was to replace Gable was running late. The judge then told Gable at the hearing if Gable found bar counsel that day, they could take care of his withdrawal from the case immediately. Missing from the record are transcripts of any subsequent hearings on August 22, 2006. The record does include, however, two orders entered later that same day: the ambiguous order appointing Thomas O'Connell and another granting Gable's motion to withdraw. O'Connell subsequently filed an appearance on August 28, 2006.

¶ 33   The court is not required to appoint a guardian *ad litem* and the record does not reveal the court ever discussed making such an appointment. Regardless, even if the court never formally appointed O'Connell as guardian *ad litem*, O'Connell's representation could still constitute a *per se* conflict of interest if he nonetheless "functioned" as guardian *ad litem*. *Austin M.*, 2012 IL 111194, ¶ 87. The Illinois Supreme Court discussed this form of "hybrid representation" in *People v. Austin M*.

¶ 34   In *Austin M.*, the parents of the minor defendant hired defense counsel to represent their son. *Id.* ¶ 6. While the trial judge never appointed him to act as guardian *ad litem*, the supreme court found the "comments and conduct" of defense counsel presented "strong evidence" of him functioning as guardian *ad litem*. *Id.* ¶ 101. Specifically, the supreme court noted: (1) the trial judge outlined defense counsel's functions as those of a guardian *ad litem*; (2) defense counsel reiterated on multiple occasions he would be taking a "best interests" and "truth-seeking" approach; (3) defense counsel stated he shared with the court and the State "the common goal of getting to 'the truth' "; (4) defense counsel admitted if his client was in fact guilty, the court must intervene to stop such acts; and (5) defense counsel never attempted to suppress the most crucial piece of evidence (the incriminating statements of the minor defendant). *Id.* ¶¶ 89-99. Considered in totality, these facts established defense counsel acted "in the best interests of his client and of society" and, thus, did not act as a "traditional defense attorney."[1] (Internal quotation marks omitted.) *Id.* ¶ 101.

¶ 35   In this case, however, no facts in the record even remotely support the argument O'Connell served as guardian *ad litem*. Instead, the record reveals O'Connell replaced Gable as defense counsel and acted in the role of a traditional defense attorney. Accordingly, we

---

[1]The court in *Austin M.* defined a "traditional defense attorney" as "an attorney whose singular loyalty is to the defense of the juvenile." *Austin M.*, 2012 IL 111194, ¶ 77.

cannot find that O'Connell functioned as guardian *ad litem* based solely on any ambiguity raised by the August 22, 2006 order. Because we do not find O'Connell served as guardian *ad litem*, we do not find there existed a *per se* conflict of interest in his representation.

¶ 36                              IV. THE MOTHER'S RIGHT TO SEPARATE COUNSEL

¶ 37        C.W. argues she was entitled to her own counsel in M.W.'s delinquency proceeding and, by failing to advise her of this right,[2] the court committed reversible error. This right derives from section 1-5(1) of the Act which states:

> "Except as provided in this Section and paragraph (2) of Sections 2-22, 3-23, 4-20, 5-610 or 5-705, the minor who is the subject of the proceeding *and his parents, guardian, legal custodian or responsible relative who are parties respondent have *** the right to be represented by counsel*. At the request of any party financially unable to employ counsel, with the exception of a foster parent permitted to intervene under this Section, the court shall appoint the Public Defender or such other counsel as the case may require." (Emphasis added.) 705 ILCS 405/1-5(1) (West 2006).

The Act requires that the court admonish the parents of these rights. 705 ILCS 405/1-5(3) (West 2006). Thus, according to C.W., the trial court committed structural error by failing to advise C.W. of her right to separate counsel and we must reverse M.W.'s finding of delinquency. We do not find this argument persuasive.

¶ 38        C.W.'s argument relies entirely on reading sections 1-5(1) and 1-5(3) together, without accounting for other specific provisions of the Act. Sections 1-5(1) and 1-5(3) appear under article I of the Act (entitled "General Provisions"). Another relevant provision, section 5-610(4), appears under article V (entitled "Delinquency of Minors"). Specifically, section 5-610(4) limits the rights provided under section 1-5(1). Section 5-610(4) reads:

> "If, during the court proceedings, the parents, guardian, or legal custodian prove that he or she has an actual conflict of interest with the minor in that delinquency proceeding and that the parents, guardian, or legal custodian are indigent, the court shall appoint a separate attorney for that parent, guardian, or legal custodian." 705 ILCS 405/5-610(4) (West 2006).

¶ 39        It is a fundamental rule of statutory construction that a specific provision controls and should be applied where it conflicts with a general provision regarding the same subject. *People v. Villarreal*, 152 Ill. 2d 368, 379 (1992). By requiring the parent prove an actual conflict of interest, section 5-610(4) conditions a parent's appointment of separate counsel in a juvenile delinquency proceeding on the existence of said conflict. In light of this requirement, we disagree with C.W.'s contention she was entitled to an attorney where no

---

[2]It is unclear from the record whether the court actually failed to give notice here. The trial judge took great care in verifying the addresses of the parents in this case so that written notice would be properly delivered. This notice was not made part of the record; thus, we will not speculate as to its contents or whether it was ultimately forwarded to M.W.'s parents.

such conflict of interest was ever alleged to have existed.

¶ 40    To hold that a parent need not show a conflict of interest to be entitled to a separate attorney would deprive section 5-610(4) of any effect. In other words, if the court must appoint a separate attorney for C.W. regardless of a conflict of interest, then section 5-610(4) serves no purpose. Section 5-610(4) was added in 1999 to the Act as part of a major reform to the State of Illinois's juvenile justice system that "[made] juvenile delinquency proceedings more akin to criminal prosecutions." *Austin M.*, 2012 IL 111194, ¶ 76; see also *People v. Taylor*, 221 Ill. 2d 157, 165 (2006) (finding the Illinois legislature "largely rewrote Article V of the Act to provide more accountability for the criminal acts of juveniles and \*\*\* to make the juvenile delinquency adjudicatory process look more criminal in nature"). We cannot simply assume this provision lacks any significance; "[t]he best evidence of legislative intent is the statutory language, given its plain and ordinary meaning." *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 193 (2009). We find the plain and ordinary meaning of section 5-620(4) requires a parent or legal guardian to prove a conflict of interest with the minor before a court shall appoint separate counsel.

¶ 41    The justification for such a requirement is apparent. The Act applies to a variety of proceedings, not just juvenile delinquency proceedings. While a general rule allowing parents separate counsel is clearly appropriate for cases involving the custody of an abused child, the same is not necessarily true of delinquency proceedings. See *In re Vaught*, 103 Ill. App. 3d 802, 804-06 (1981) (distinguishing juvenile delinquency proceedings from child custody or neglect proceedings in determining whether or not the father was a necessary party); see also *In re A.H.*, 549 N.W.2d 824, 826-27 (Iowa 1996) (finding that Iowa's legislature amended the state's Juvenile Justice Act to authorize a separate right to counsel for parents in termination or neglect cases, but not for delinquency proceedings); *In re Jesse V.*, 263 Cal. Rptr. 369, 373 (Cal. Ct. App. 1989) (finding specifically in delinquency proceedings, a parent's right to appointed counsel is up to the discretion of the court). Separate counsel in a juvenile delinquency proceeding would often be unnecessary. Because legal guardians generally share the interests of the minor, one attorney can adequately represent the interests of both the guardian and child in most cases. Only in such instances where the guardian's and minor's interests diverge–for example, where the minor implicates a parent in the crime or accuses a parent of child abuse–would a separate attorney be particularly useful.

¶ 42    C.W. does not assert that any conflict of interest exists in this case or that a separate attorney would have been necessary. C.W. does not contend she would have requested an attorney. C.W. does not argue the outcome would have been any different if she had counsel. Instead, C.W. argues solely that the failure to advise her of her rights under section 1-5(1) amounts to a denial of her right to separate counsel. Since C.W. was not a party entitled to relief under section 5-610(4), C.W. was not denied the right to a separate attorney.

¶ 43    V. MOTION TO DISMISS AND FINDING OF DELINQUENCY

¶ 44    C.W. challenges both the trial court's denial of M.W.'s "Motion to Dismiss and Other Relief" and the trial court's adjudication of delinquency. We need not address the substance of these challenges because C.W. lacks standing to appeal these orders. Parents can only

appeal a decision that affects their own rights and lack standing to appeal issues only concerning the minor. *In re J.R.*, 2011 IL App (3d) 100094, ¶ 13; *In re D.M.A.*, 136 Ill. App. 3d 1027, 1029 (1985). As both M.W.'s motion to dismiss and the adjudication of delinquency involve issues concerning only the minor, C.W. lacks standing to appeal these issues.

¶ 45                                   CONCLUSION

¶ 46        For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.


¶ 47        Affirmed.