NOTICE
Decision filed 11/07/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250423-U

NOS. 5-25-0423, 5-25-0424, 5-25-0425 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* BRAYTON C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Vermilion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 24-JD-161, 24-JD-63, 24-JD-129 |
| | ) | |
| Brayton C., | ) | |
| | ) | Honorable Thomas M. O'Shaughnessy, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE HACKETT delivered the judgment of the court.
Presiding Justice McHaney and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's findings in case No. 24-JD-161 that the State had proven, beyond a reasonable doubt, that the respondent committed aggravated battery on a public way based on accountability is affirmed. The trial court's orders in case Nos. 24-JD-63 and 24-JD-129 revoking the respondent's probation based on the commission of the aggravated battery on a public way are also affirmed. Further, we affirm the trial court's imposition of the previously stayed five-year adult sentence in case No. 24-JD-129.

¶ 2    The respondent, Brayton C., was adjudicated delinquent in Vermilion County case No. 24-JD-63 for aggravated unlawful use of a weapon (AUUW) and sentenced to 30 months of probation. The respondent was also adjudicated delinquent under the extended jurisdiction juvenile (EJJ) provision of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-810 (West 2022)) and sentenced to five years of imprisonment for possession of a firearm without a valid firearm owners

identification card (FOID) in Vermilion County case No. 24-JD-129. The respondent's sentence was subject to a mandatory stay until the successful completion of his juvenile probation sentence of 36 months in this case. Thereafter, the State sought to revoke the respondent's probation in both cases based on the State filing a new petition for adjudication of wardship in Vermilion County case No. 24-JD-161, which alleged that the respondent committed aggravated battery on a public way (720 ILCS 5/12-3.05(c) (West 2022)), mob action (*id.* § 25-1(a)(1)), and unlawful use of a weapon (*id.* § 24-1(a)(2)). The State also sought to invoke the five-year adult sentence in case No. 24-JD-129.

¶ 3    Following a trial, the trial court found that the State had proven the aggravated battery on a public way and mob action charges beyond a reasonable doubt and entered judgments on those counts. The trial court also granted the State's petitions to invoke the adult sentence in case No. 24-JD-129 and to revoke the respondent's probation in case Nos. 24-JD-63 and 24-JD-129. The trial court then imposed the previously stayed five-year adult sentence in case No. 24-JD-129. In addition, the trial court sentenced the respondent to an indeterminate sentence in the Illinois Department of Juvenile Justice (DOJJ) not to exceed three years or the respondent's twenty-first birthday, whichever came first, in case No. 24-JD-63; and sentenced him to an indeterminate sentence in the DOJJ not to exceed four years or his twenty-first birthday, whichever came first, in case No. 24-JD-161. The respondent appeals,[1] arguing that the State failed to prove him guilty beyond a reasonable doubt of aggravated battery on a public way and mob action. For the reasons that follow, we affirm.

---

[1]The respondent filed notices of appeal in all three Vermilion County cases, and they were docketed in our court as 5-25-0423, 5-25-0424, and 5-25-0425. Thereafter, on September 2, 2025, this court consolidated all three cases under 5-25-0423.

¶ 4                                    I. BACKGROUND

¶ 5        As a preliminary matter, because this appeal involves a final order from a delinquent minor proceeding arising out of the Act (705 ILCS 405/1-1 *et seq.* (West 2022)), Illinois Supreme Court Rule 660A(f) (eff. July 1, 2018) requires that, except for good cause shown, the appellate court issue its decision within 150 days of the filing of the notice of appeal. Accordingly, the decision in this case was due on October 16, 2025. However, due to the appellant requesting extensions of time to file his initial appellant brief, the appellant's reply brief was not filed until October 9, 2025. This case was placed on the October 29, 2025, oral argument schedule. Thus, there was good cause for issuing our decision outside the 150-day deadline.

¶ 6        On April 22, 2024, the State filed a petition for adjudication of wardship against the respondent, who was 16 years old at the time, in case No. 24-JD-63. In the petition, the State alleged that the respondent committed the offenses of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2022)), possession of a firearm without a valid FOID card (430 ILCS 65/2(a)(2) (West 2022)), reckless discharge of a firearm (720 ILCS 5/24-1.5(a) (West 2022)), and AUUW (*id.* § 24-1.6(a)(1), (a)(3)(I)). On June 10, 2024, the respondent admitted to the AUUW count. Pursuant to an agreement with the State, the State dismissed the remaining counts, and the trial court subsequently sentenced the respondent to 30 months of probation.

¶ 7        On August 22, 2024, the State filed a petition for adjudication of wardship against the respondent in case No. 24-JD-129, alleging that he committed one count of AUUW/subsequent offense (*id.*), one count of possession of a firearm without a valid FOID card (430 ILCS 65/2(a)(2) (West 2022)), two counts of aggravated fleeing or attempting to elude a police officer (625 ILCS 5/11-204.1(a)(4) (West 2022)), one count of AUUW (720 ILCS 5/24-1.6(a)(1), (a)(3)(I) (West 2022)) , and one count of resisting or obstructing a police officer (*id.* § 31-1(a)(1)). Also, the State

3

filed a petition to designate the respondent's case as an EJJ prosecution under section 5-810 of the Act (705 ILCS 405/5-810 (West 2022)). The petition alleged that the respondent was 17 years old at the time that he committed the AUUW and that the offense would constitute a felony if committed by an adult. In an EJJ prosecution, if the minor is found guilty, the circuit court must impose both a juvenile sentence and an adult sentence and must stay the adult sentence with the condition that the minor not violate the terms of the juvenile sentence. *Id.* § 5-810(4); *In re Christopher K.*, 217 Ill. 2d 348, 355 (2005).

¶ 8    On October 1, 2024, the State filed an amended petition asking the trial court to designate the proceeding as an EJJ prosecution based on the respondent committing the offense of possession of a firearm without a valid FOID card, which also would have been a felony if committed by an adult. That same day, the circuit court designated the case for EJJ prosecution, and the respondent admitted to the offense of possession of a firearm without a valid FOID card. Pursuant to an agreement with the State, the remaining counts in case No. 24-JD-129 were dismissed, another case that was filed against the respondent was dismissed, and the trial court sentenced the respondent to 36 months of probation to run concurrently with the 30-month probation term in case No. 24-JD-63. In addition, pursuant to the EJJ provisions of section 5-810 of the Act, the trial court sentenced the respondent to five years of imprisonment to be imposed only if he failed to successfully complete his juvenile sentence.

¶ 9    On October 15, 2024, the State filed a petition for adjudication of wardship against the respondent in case No. 24-JD-161, alleging that the respondent committed the offenses of aggravated battery on a public way, mob action, and unlawful use of a weapon. The offenses were based on an incident that occurred on or about October 13, 2024, in which the respondent was allegedly a participant in a fight that took place on a public street. Also, on October 17, 2024, the

4

State filed petitions for revocation of the respondent's probation in case Nos. 24-JD-63 and 24-JD-129 and a petition to invoke the previously imposed adult sentence and to terminate the respondent's EJJ status in case No. 24-JD-129.

¶ 10    At the January 28, 2025, adjudication hearing, Jared Evans, an officer with the Danville Police Department, testified that, on October 13, 2024, at around 10:10 p.m., he was dispatched to 816 Franklin, Danville, Illinois, based on a report that a "[g]roup of males jumped a female," and one of them displayed a firearm. Officers Fox, Sentelle, and Robinson were also dispatched to the scene. When Officer Evans arrived, he observed two females and one male walking east toward an SUV. Based on statements that Officer Evans obtained from the other individuals at the scene, he believed that the three individuals were suspects in the incident. Officer Fox spoke to the suspects and identified the females as Anastacia P. and Brooklyn C. Officer Fox then told Officer Evans that an individual was hiding in the nearby SUV. Officer Evans also had information that there was a "mixed male" who was armed at the scene, and he observed a "mixed male" in the backseat of the SUV. That individual was ultimately secured and identified as Christian B. In addition, the respondent was discovered in the driver's seat floorboard area of the SUV. The respondent was wearing a blue hoodie at the time.

¶ 11    Andrew Sentelle, a police officer with the Danville Police Department, testified that when he arrived at the scene, Kaylin H., Kaleb R., and McKenzie B. were there. Kaylin had multiple cuts and marks on her face and arms. Officer Sentelle collected a pink baseball bat from the residence's front yard. Officer Sentelle did not know if any attempts were made to obtain fingerprints or DNA evidence from the baseball bat.

¶ 12    Kaylin testified that she lived at 816 North Franklin Street. At around 10 p.m. on the night of the incident, she was outside the residence when she began receiving phone calls from Brooklyn

5

asking whether she was home and saying that "they" were going to come over. Her brother Kaleb was with her, and her cousin, McKenzie, and aunt, Jennifer B., were on their way over. Kaylin was still outside with her brother when she observed four individuals walking toward her house. The four individuals consisted of Anastacia, Brooklyn, the respondent, and another male that she could not identify. Kaylin observed that all four individuals "had their hoods on," and the two males wore masks covering their face except for their eyes. She also observed that one of the males had his hands in his pockets as if he had a "gun on him or something." According to Kaylin, "they" asked her "what's up," she approached them as they stood in the street, and "they started swinging." Kaylin explained that the fight was "kind of" arranged and that Kaylin was supposed to fight Brooklyn because Kaylin was tired of dealing with months of harassment. However, Anastacia punched her first, and they started fighting. At some point during the fight, Kaylin felt a "bunch of people *** getting on top of [her] and pulling [her] hair." When asked to identify who jumped on top of her, she identified Brooklyn and the male wearing "all black." She noted that the male wearing "all black" punched her in the face and that Kaleb intervened and grabbed him off her. Kaylin did not remember what the second male was wearing.[2]

¶ 13    Kaleb then told everyone to back up, but someone hit him with a baseball bat. At the time, Kaylin did not see the baseball bat because her hair was in front of her face. However, she did see the bat on the ground after the fight. When asked whether all four individuals were involved in the fight, she responded, "Just three that I know of on me. I'm not sure about the other fourth boy." She then clarified that she meant to say, "the second boy" or the "fourth person." She explained that the second male was "just really arguing with [her] brother just really with going back and

---

[2]From our review of the record, and the appellate briefs, it appears that the male wearing all black was Christian B. and that the "second male" referred to by Kaylin and later by Kaleb was the respondent.

forth with [her] brother at the time." Kaylin noted Jennifer then got involved in the fight because Brooklyn would not let go of Kaylin's hair. The fight stopped after lasting approximately three minutes. When the fight stopped, the four individuals started to run together in the same direction from which they had come.

¶ 14   Kaylin identified the respondent as one of the males present during the fight. Although he wore a mask over his face during the incident, she recognized him from his eyes and hair. Kaylin noted that the respondent's hair was "poking out a little bit." When asked whether the respondent spoke during the incident, she responded, "[n]ot really, no." She was not sure whether the respondent was the person with the baseball bat.

¶ 15   On cross-examination, Kaylin indicated that, during the telephone calls with Brooklyn, there was some discussion about the two of them fighting. Kaylin agreed to fight Brooklyn that night, but she explained that she did not expect to get "jumped." Kaylin believed that Brooklyn was coming to Kaylin's house alone. Kaylin noted that the male wearing black clothing was one of the three involved in the fight. Kaylin explained that the second male was trying to jump into the fight, but Kaleb interfered and held the male back so the fight would only be between the females. She noted that the second male was arguing with Kaleb. Although Kaylin had heard of the respondent before this incident, she did not know him and did not have any problems with him. Kaylin was initially wearing a hoodie, but she took it off because they were pulling it over her head so that she could not see.

¶ 16   Kaleb testified that, on the night of the incident, he was sitting outside smoking with Kaylin and McKenzie. He observed four individuals walking around the corner and yelling. He did not know the individuals, but he noted that there were two males and two females. Kaylin then approached them in the street, and a fight started between Kaylin and one of the females. Kaleb

7

had just moved into the house, so he was not sure what was going on, but it was his understanding that his sister was supposed to fight one of the women. Kaleb noticed that the two males were wearing hats and masks, and Kaleb stepped forward. When Kaleb stepped forward, one of the males hit him with a pink baseball bat. After Kaleb was hit a second time with the bat, he grabbed the male and took the bat. The second male then ran up, and Kaleb tried to keep that male from intervening in the fight between the females. Kaleb was not sure what was happening with Kaylin at this time because he was busy. Kaleb agreed that the two males were involved in the "melee." Kaleb noted that the fight ended quickly, and at the end of the fight, the four individuals ran away.

¶ 17    Less than five minutes after the fight ended, the police brought Kaleb to a show-up, which was less than one block from the scene and involved two males and two females. Kaleb identified those individuals as the ones involved in the fight by their clothing. When asked whether it was fair to say that both males were involved in the fight, Kaleb responded, "The other one not so much[,]" meaning the second male. When Kaleb was asked to clarify, Kaleb explained that the male either had something in his waistband or was acting like he had something in his waistband. Also, Kaleb noted the following when Kaleb took the baseball bat from the first male: "[the second male] ran up and acted like he was going to do something. And I (indicating)." Although Kaleb gave a demonstration of the physical motion during his testimony, the record does not indicate what motion was made. Kaleb then noted that both males were involved and that all four individuals came to the residence together.

¶ 18    On cross-examination, Kaleb acknowledged that he would not be able to identify the males by their faces as they were wearing masks and hoods, and he had never seen their faces. However, Kaleb explained that he could identify them because they were wearing the same clothing, they

8

had the same stature, and they were found not even one block from the location of the altercation. When Kaleb saw the two males, they were already in police custody.

¶ 19     On redirect examination, Kaleb clarified that the females were not wearing masks, so he could identify them by their faces. When asked whether the two females were the same as the two females that were involved in the altercation, he responded, "Yes. I mean, I got bad eyes. I can't see faces, but *** I can see colors, and I can see what people are wearing." The State then rested.

¶ 20     Brooklyn, the respondent's sister, testified that on the night of the incident, she was with Anastacia when Kaylin called and told Brooklyn to come to Kaylin's house so that they could fight. Brooklyn denied having any issues with Kaylin at that time. Anastacia then drove Brooklyn, Christian, and the respondent to Kaylin's house. Anastacia parked the vehicle on a street near Kaylin's house. Brooklyn and Anastacia then got out of the vehicle, approached Kaylin's house, and Anastacia and Kaylin started fighting. Brooklyn also got involved in the fight. Brooklyn admitted to the charges that were brought against her in juvenile court as a result of the fight and that she was on probation.

¶ 21     Brooklyn testified that during the fight, Christian and the respondent remained in the vehicle. They were not involved in the fight, which lasted less than three minutes. The fight stopped and then Kaylin called the police. The police were there by the time that Brooklyn and Anastacia returned to the vehicle. Brooklyn and Anastacia were still on the street when the police arrested Brooklyn. Christian and the respondent were inside the vehicle. Brooklyn explained that neither Christian nor the respondent exited the vehicle at any time during the fight. Brooklyn also claimed that neither Christian nor the respondent hit or tried to hit Kaylin. Brooklyn denied knowing anything about the baseball bat and denied that either Christian or the respondent used the baseball bat during the fight. Brooklyn never told the respondent what she thought was going

to happen at Kaylin's house. She explained that he just came along and did not know what was going on.

¶ 22    On cross-examination, Brooklyn explained that she did not have any issues with Kaylin leading up to the fight, but that Kaylin had an issue with Anastacia. Brooklyn noted that Anastacia was a friend of a friend. Brooklyn admitted that she was involved in the fight, but she explained that she "didn't necessarily, like, just fight her." Brooklyn further explained that she only hit Kaylin a "few times." Anastacia parked the vehicle around the corner from Kaylin's house and then the two of them walked to Kaylin's house. Once the police arrived after the fight was over, Kaylin walked to Anastacia's vehicle. Brooklyn denied bringing a baseball bat to the fight. Brooklyn claimed that someone with Kaylin brought the bat. Brooklyn could see the vehicle from Kaylin's house, and Christian and the respondent remained in the vehicle during the fight. Christian and the respondent only exited the vehicle when the police arrived.

¶ 23    On redirect examination, Brooklyn indicated that she just went along with Anastacia to Kaylin's house. Brooklyn reiterated that Christian and the respondent were already with Brooklyn and Anastacia, Christian and the respondent just rode along, and neither one knew what was going to happen. Brooklyn noted that there were four people with Kaylin, she did not know them, and she did not know which one brought the bat.

¶ 24    Thereafter, the respondent's counsel indicated that the respondent was not going to testify and did not present any evidence. Following closing arguments, the trial court found that the State had failed to prove the unlawful use of a weapon charge beyond a reasonable doubt. The trial court noted that although the pink baseball bat was located by the police in Kaylin's yard, the State's witnesses could not place the bat in the respondent's hands. The trial court stated that Kaylin was not even aware of the bat's existence until after the fight, and Kaleb never identified the clothing

10

of the person who possessed the bat despite the evidence being that the respondent was wearing blue, and Christian was wearing black. Thus, the trial court dismissed this charge.

¶ 25   As for the remaining charges, the trial court indicated that Brooklyn's testimony that the respondent and Christian never left the vehicle was "belied and directly contradicted" by Officer Evans's testimony that when he arrived at the scene, he observed three subjects, one male and two females, walking toward a vehicle. Thus, the trial court found that Brooklyn's testimony that the two males never left the vehicle was not credible. The trial court also indicated that Kaleb's testimony as to the number of individuals who approached the home was specific in the sex of those individuals, that they came around the corner yelling, and that he did not know them before this incident. The trial court also noted that Kaleb volunteered that his eyesight was not good but that he was able to identify that two out of the four individuals were males, which prompted Kaleb's involvement. The trial court found Kaylin's testimony as to the males' involvement, along with the corroborating testimony of Officer Evans of seeing at least one of the males outside the vehicle when the police first arrived, and not just when the police ordered the males out of the vehicle, to be more credible than Brooklyn's testimony.

¶ 26   The trial court then noted that the aggravated battery on a public way charge was based on an accountability theory. The trial court found that all four individuals were involved in the incident, which included the respondent; that all four were accountable for the conduct of the others in the commission of the offenses; and that all four were present during the incident. The trial court also found that all four individuals aided and abetted in the commission of the aggravated battery on a public way. Further, the trial court found that the respondent was legally accountable for the others' actions in causing bodily harm to Kaylin which occurred, according to the testimony, in the street, which was a public way. Therefore, the trial court concluded that the State had proven,

11

beyond a reasonable doubt, the aggravated battery on a public way charge. In addition, the trial court found that the respondent was present and a participant in the use of force which disturbed the public peace. Thus, the trial court found that the State had proven, beyond a reasonable doubt, the mob action charge.

¶ 27 On February 27, 2025, the respondent filed a posttrial motion, arguing that the evidence was insufficient to prove him guilty of aggravated battery on a public way and mob action as his alleged involvement in the incident was not sufficient to find him guilty through accountability. Specifically, the defendant noted that Kaylin identified one of the males present as the respondent, despite the fact that the individual was wearing a mask and did not speak; Kaylin did not testify that the respondent participated in the fight; Kaleb testified that neither male present during the fight struck Kaylin; in the show-up, Kaleb was unable to identify the respondent other than by similar clothing; and Brooklyn testified that the respondent was not present and did not participate in the fight.

¶ 28 On March 3, 2025, the trial court held a hearing on the respondent's posttrial motion filed in case No. 24-JD-161, the State's petitions to revoke the respondent's probation in case Nos. 24-JD-63 and 24-JD-129, and the State's petition to invoke the adult sentence in case No. 24-JD-129. The trial court first addressed the respondent's posttrial motion, and after hearing arguments from both sides, announced its decision to deny that motion. In denying the motion, the trial court noted that Kaylin positively identified the respondent as being present at the scene of the incident, that Kaleb identified the assailants as two males and two females, and that Kaleb subsequently identified the individuals by their clothing at the police show-up. The trial court also noted that the testimony from the law enforcement officers established that four individuals, two males and two females, were stopped and held in custody within one block of the scene. The trial court further

noted that it had found that Brooklyn's testimony was not credible as she claimed that neither Christian nor the respondent left the vehicle that night, but the police officer testified that he had observed, prior to anyone being placed in custody or prior to him ordering the individuals out of the vehicle, at least three individuals outside the vehicle when he first arrived on the scene. Thus, the trial court found that the State had presented sufficient evidence to establish, beyond a reasonable doubt, that the respondent committed aggravated battery on a public way and mob action and that these offenses were committed by four individuals acting in concert.

¶ 29     The trial court then immediately proceeded to the hearing on the petitions to revoke the respondent's probation and the petition to invoke the adult sentence. The trial court first took judicial notice of its findings in case No. 24-JD-161. The trial court then found that the State had established, by a preponderance of the evidence, that the respondent had violated his probation in case Nos. 24-JD-63 and 24-JD-129 by committing the new offenses in case No. 24-JD-161.

¶ 30     On April 14, 2025, the trial court held the dispositional hearing in all three cases. At the hearing, the trial court entered judgments on the State's petitions in case Nos. 24-JD-63 and 24-JD-129, revoked the respondent's probation in those cases, and terminated the EJJ prosecution in case No. 24-JD-129. The parties did not present any evidence as to sentencing, but the respondent's counsel asked that the respondent be readmitted to probation for the maximum amount on each count, including the EJJ case. The respondent declined to make a statement. The trial court then noted that in an EJJ prosecution, when the State established that the respondent had committed a new offense, the imposition of the adult sentence was mandatory. Thus, in case No. 24-JD-129, the trial court imposed the previously stayed five-year adult sentence to be followed by a one-year period of mandatory supervised release. In case No. 24-JD-63, the trial court imposed a sentence of commitment to the DOJJ for an indeterminate term not to exceed three years or until the

respondent's twenty-first birthday, whichever came first. In case No. 24-JD-161, the trial court imposed a sentence of commitment to the DOJJ for an indeterminate term not to exceed four years or until the respondent's twenty-first birthday, whichever came first. The sentences in each case were to be served concurrently. The trial court also found that the mob action merged into the aggravated battery on a public way. The respondent appeals.

¶ 31                                    II. ANALYSIS

¶ 32    In delinquency proceedings, the State must prove the elements of the substantive offenses alleged in the delinquency petition beyond a reasonable doubt. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 47. When considering a challenge to the sufficiency of the evidence, the reviewing court asks whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *In re Gabriel W.*, 2017 IL App (1st) 172120, ¶ 28. A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Parrott*, 2017 IL App (3d) 150545, ¶ 26.

¶ 33    Since the trial court has the best opportunity to observe the demeanor and conduct of the parties and witnesses, it is in the best position to determine the credibility and weight of the witnesses' testimony. *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). A reviewing court does not retry the defendant on appeal. *People v. Austin M.*, 2012 IL 111194, ¶ 107. A trial court's credibility determinations will be upheld on review unless they are against the manifest weight of the evidence. *In re Christopher K.*, 217 Ill. 2d at 373. A finding is against the manifest weight of the evidence only where the opposite conclusion is apparent or where the findings are unreasonable, arbitrary, or not based on evidence. *In re M.W.*, 2013 IL App (1st) 103334, ¶ 13.

14

¶ 34　Here, the respondent was found guilty of aggravated battery on a public way based on a theory of accountability and mob action. For aggravated battery on a public way, the State must prove that, in committing a battery, other than by discharging a firearm, he is or the person battered is on or about a public way. 720 ILCS 5/12-3.05(c) (West 2022). A person commits a battery when he knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual. *Id.* § 12-3(a). In addition, a person commits mob action when he engages in the knowing or reckless use of force or violence disturbing the public peace by two or more persons acting together and without authority of law. *Id.* § 25-1(a)(1).

¶ 35　Under Illinois law, a person is legally accountable for the conduct of another when either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense. *People v. Batchelor*, 171 Ill. 2d 367, 375 (1996); 720 ILCS 5/5-2(c) (West 2022). "The mere presence of a defendant at the scene of a crime, even when the defendant knows that a crime is being committed, is insufficient, without more, to establish accountability." *Batchelor*, 171 Ill. 2d at 375-76. However, active participation is not a requirement for imposing criminal liability under an accountability theory. *People v. Taylor*, 164 Ill. 2d 131, 140 (1995). Thus, the person may aid and abet without actively participating in the overt act. *Id.*

¶ 36　To prove that the defendant possessed the intent to promote or facilitate the offense, the State may present evidence that either (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 13. "[S]hared intent and common design are two separate bases upon which the State can prove legal accountability." *People v. Phillips*, 2014 IL App (4th) 120695, ¶ 48.

15

¶ 37    A defendant's mental state is ordinarily proved circumstantially by inferences reasonably drawn from the evidence. *People v. Baker*, 2022 IL App (4th) 210713, ¶ 50. A defendant's intent may be inferred from the nature of the defendant's actions and the circumstances accompanying the criminal conduct. *People v. Ivory*, 333 Ill. App. 3d 505, 512 (2002).

¶ 38    The common design rule focuses on whether the defendant was part of a group bent on illegal acts and not on whether the defendant intended for any particular crime to occur. *Baker*, 2022 IL App (4th) 210713, ¶ 49. Under this rule, if two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts. *Fernandez*, 2014 IL 115527, ¶ 13. "Words of agreement are not needed to establish a common design." *Ivory*, 333 Ill. App. 3d at 512. Unlike with the shared-intent cases, in a common-design case, the State need only prove that the defendant had the specific intent to promote or facilitate a crime, rather than the charged crime. *Baker*, 2022 IL App (4th) 210713, ¶ 38. Also, "[a] conviction under accountability does not require proof of a preconceived plan if the evidence indicates involvement by the accused in the spontaneous acts of the group." *People v. Cooper*, 194 Ill. 2d 419, 435 (2000).

¶ 39    Proof that the defendant: (1) was present during the perpetration of the offense, (2) fled from the scene of the crime, (3) maintained a close affiliation with his companions after the commission of the crime, and (4) failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability. *Taylor*, 164 Ill. 2d at 141. Moreover, evidence that the defendant voluntarily attached himself to a group bent on illegal acts with knowledge of the group's design supports an inference that the defendant shared the group's common purpose. *Id.* " 'With knowledge of [the group's] design' means only that a person who

16

attached himself to a group knew that the group intended to engage in criminal behavior of some kind—nothing more specific is required." *People v. Jackson*, 2020 IL App (4th) 170036, ¶ 49. Thus, for legal accountability in a common design case, the evidence must show that the group intended to engage in some form of criminal behavior, and the defendant was aware of the group's intentions. *Id.*

¶ 40    Here, the respondent concedes that a battery was committed and that the victim was on or about a public way at the time of the battery. However, the respondent argues that the evidence was insufficient to demonstrate that he participated in the fight; that he solicited, ordered, abetted, agreed, or attempted to aid in the planning or commission of the aggravated battery; or that he had the intent to promote or facilitate the offense. The respondent argues that the evidence only showed his mere presence at the scene, and the State failed to show that he shared a criminal intent or common plan.

¶ 41    This court is obligated to review the evidence from the trial proceedings in the light most favorable to the State. Using that standard, we find that there was sufficient evidence for a rational trier of fact to find that the respondent was accountable for the aggravated battery of Kaylin. The evidence demonstrated that around 10 p.m. on the night in question, Brooklyn and Kaylin spoke on the phone to plan a fight. Then, Brooklyn went to Kaylin's house either to engage in a fight with Kaylin herself or to be present while Anastacia and Kaylin fought. Anastacia, Brooklyn, Christian, and the respondent all rode in the same vehicle to Kaylin's house. They parked around the corner from the house and walked the rest of the way there. Even though Kaylin and Kaleb both testified that they did not know the respondent, the respondent went with Anastacia and Brooklyn to Kaylin's house. Also, Kaylin and Kaleb both testified that Christian and the

17

respondent wore masks concealing their faces except for their eyes and had their "hoods on." Kaleb testified that one of them had a pink baseball bat, which the police found at the scene.

¶ 42    Although there was no evidence presented to demonstrate that the respondent personally physically battered Kaylin, Kaleb testified that he intentionally interfered with the respondent to prevent the respondent's further involvement in the fight. Kaleb also stated that the second male "ran up" to Kaleb after Kaleb was struck by the bat, and that the male "acted like he was going to do something." During his testimony, Kaleb demonstrated the second male's physical motion, and although there is no description in the record on appeal of the movement, the demonstration was witnessed by the trial court. Similarly, even with Kaylin's view being obstructed during the fight, she noticed the second male attempting to jump into the fight. However, she noted that Kaleb interfered and kept the male from joining the fight. Kaylin also noted that the second male was arguing with Kaleb during the fight, although, as the respondent notes, we do not know what they were saying during that argument. Moreover, while the defendant's opportunity to dissociate himself from the others or report the crime was limited by his swift apprehension, the evidence demonstrated that following the fight, he fled with the others and was subsequently discovered by police shortly thereafter on the floorboard of Anastacia's vehicle.

¶ 43    In contrast, Brooklyn testified that the respondent remained in the vehicle during the entirety of the fight, was not involved in the fight at all, and was not even aware of the plan for a fight to take place that night when he went with her to Kaylin's house. Instead, Brooklyn explained that the respondent just "came along" because he was with them. However, the trial court found that Brooklyn's testimony that the respondent remained in the vehicle was "belied and directly contradicted" by Officer Evans's testimony that when he arrived at the scene, he observed three subjects, one male and two females, walking toward a vehicle. Also, the trial court noted that

Kaylin positively identified the respondent as being present at the scene and the testimony from the police officer was that four individuals, two males and two females, were stopped and held in custody within one block of the scene. The trial court further noted that Kaleb identified the assailants as two males and two females and identified them by their clothing at the police show-up. Thus, even after hearing Brooklyn's testimony, the trial court found that the State had presented sufficient evidence that the respondent was legally accountable for the aggravated battery. The factfinder, not a reviewing court, must assess the credibility of the witnesses, resolve conflicts in the evidence, and decide what reasonable inferences to draw from the evidence. *In re Gino W.*, 354 Ill. App. 3d 775, 777 (2005).

¶ 44 The respondent argues that while the State fails to recognize that the respondent's actions may not have been reasonable when compared to an adult, they were perfectly understandable when compared to a child. Specifically, the respondent notes that he was on probation at the time of the fight, he was likely not thinking rationally after witnessing a fight between his younger sister and a grown woman, and he was likely terrified of being arrested for violating his probation's curfew requirement and having to explain himself to the police. Thus, instead of staying behind at a location where his sister was just involved in a fight so that he could talk with police, the respondent fled with the group that he arrived with and hid. However, we again note that the trial court, knowing the respondent's age at the time of the offense, and hearing all of the testimony about the respondent's involvement in the fight, and his subsequent flight from the scene, found that sufficient evidence was presented to find that the respondent aided and abetted in the commission of the aggravated battery on a public way.

¶ 45 Given the above, a rational trier of fact could find that either Brooklyn and/or Anastacia had a plan to confront and fight Kaylin; the plan involved violence; the defendant knew of this

19

plan; and knowing this, the defendant decided to accompany them and participate in some manner. In other words, a rational trier of fact could have found that (1) Brooklyn and/or Anastacia were going to confront Kaylin and commit some type of battery upon Kaylin, and (2) the defendant voluntarily joined this group with knowledge that the group was bent on illegal acts. Therefore, we find the evidence, when viewed in the light most favorable to the State, was sufficient to establish the defendant's guilt of aggravated battery on a public way based on accountability. Since we find that the defendant's challenge to the sufficiency of the evidence on the aggravated battery on a public way finding lacks merit, and the mob action merged into the aggravated battery, we will not address the respondent's arguments concerning the trial court's finding of guilt on the mob action.

¶ 46    Further, we note that the respondent's probation was revoked in case Nos. 24-JD-63 and 24-JD-129 based on the trial court finding the respondent guilty of aggravated battery on a public way. Since we affirm the trial court's decision finding the defendant guilty of aggravated battery on a public way based on accountability in case No. 24-JD-161, we therefore also affirm the trial court's orders revoking the respondent's probation in case No. 24-JD-63 and case No. 24-JD-129, and the trial court's order imposing the previously stayed adult sentence in case No. 24-JD-129.

¶ 47                                III. CONCLUSION

¶ 48    For the foregoing reasons, the judgment of the circuit court of Vermilion County is hereby affirmed.

¶ 49    Affirmed.